[No. D069229. Fourth Dist., Div. One. Apr. 19, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL CHRISTOPHER LUCERO, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.A. and III.C.

**COUNSEL**

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew S. Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

## I.

## INTRODUCTION

A jury found Michael Christopher Lucero guilty of murder (Pen. Code, § 187, subd. (a))[1] (count 1), second degree robbery (§ 211) (count 2), and assault with a semiautomatic firearm (§ 245, subd. (a)(2)) (count 5). The jury also found true an allegation that Lucero committed the murder during the course of a robbery. In addition, with respect to counts 1, 2, and 5, the jury

---

[1] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

found true allegations that Lucero personally and intentionally discharged a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivision (d) and personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c).[2]

On appeal, Lucero claims that the trial court erred in failing to instruct the jury on count 1 on the lesser included offenses of second degree murder, voluntary manslaughter and involuntary manslaughter, given the evidence of his voluntary intoxication presented at trial. In an unpublished portion of this opinion, we conclude that any error in failing to instruct on second degree murder was harmless and that the trial court did not err in failing to instruct the jury on voluntary manslaughter and involuntary manslaughter. Lucero also claims that the trial court erred in instructing the jury that it could not consider evidence of Lucero's voluntary intoxication in determining whether he personally and intentionally discharged a firearm causing bodily injury or death within the meaning of section 12022.53, subdivision (d) and personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c). In a published portion of this opinion, we conclude that the trial court properly instructed the jury that it could not consider Lucero's voluntary intoxication for purposes of determining the truth of these firearm enhancement allegations. Finally, in an unpublished portion of this opinion, we direct the trial court to correct an error in the abstract of judgment. Accordingly, we affirm the judgment and remand the matter to the trial court to prepare a corrected abstract of judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual background*

#### 1. *The events leading up to the robbery and killing*

Ahmed Silmi frequently kept cash deposits from his businesses in the trunk of his Mercedes. One of Silmi's friends, victim Darius Silveira, owned a barbershop in Fontana. On May 23, 2012, at approximately 6:30 p.m., Silmi went to visit Silveira at the barbershop. Silmi had a large amount of cash in the trunk of his Mercedes. Approximately 30 minutes later, Lucero, whom Silmi had known for a few weeks, arrived at the barbershop. The three men smoked methamphetamine together.

Silmi went outside the barbershop and smoked a cigarette with Lucero. While the two men were outside, Silmi received a phone call from one of his

---

[2] We describe here only the offenses and sentencing allegations relevant to Lucero's claims on appeal, and provide a full procedural history in part II.B., *post.*

employees. Silmi and the employee discussed Silmi picking up deposits. After the phone call, Silmi told Lucero that he had to leave to pick up some deposits. Silmi left the barbershop shortly thereafter. Lucero also left the barbershop in a separate vehicle.

At approximately 7:54 p.m., Lucero called Fontana Police Officer Buddy Porch. Lucero told Officer Porch that the driver of a Mercedes with Silmi's license plate number had something illegal on his person. Lucero described the location of the Mercedes. Officer Porch responded to the location and conducted a traffic stop of Silmi's vehicle. Silmi had $18,228 in cash and 44 cellular phones in the Mercedes. Silmi was taken into custody on an outstanding traffic warrant.

With Officer Porch's permission, Silmi contacted Silveira and asked Silveira to come to the location of the traffic stop and take possession of the cash and the phones. According to Silmi, before Silveira arrived, Lucero appeared at the scene of the traffic stop and told Silmi that he could take "what it is that I was trying to get to Silveira," to him. Silmi declined the offer, and Lucero left. Silveira then arrived, placed the cash and phones in the trunk of the car he was driving and left. Officer Porch took Silmi to jail.

Authorities released Silmi from jail the following morning at approximately 6:30 a.m. Silmi sent a text message to Silveira at approximately 6:45 a.m., requesting that Silveira pick him up from the jail.

### 2. *The robbery and killing*

Meanwhile, at some point after leaving the location of the traffic stop, Lucero went back to the barbershop and visited with Silveira throughout the rest of that night and into the morning. At approximately 7:00 a.m. the following morning, Silveira agreed to give Lucero a ride to his van on his way to pick up Silmi from jail. Silveira drove Lucero to his van. As he was exiting the car, Lucero pointed a gun at Silveira and told him to open the trunk of the car. When Silveira attempted to drive away, Lucero shot him several times.

Alejandro Cardoso was driving his car near the scene of the shooting immediately after the shooting occurred. Cardoso saw the car that Silveira was driving crash into a house. Moments later, he observed Lucero run to a van parked nearby and drive away.

At approximately 7:06 a.m., Officer Michael Bernholtz of the Fontana Police Department arrived at the scene of the crash. Bernholtz saw that a vehicle had crashed into a house and also saw a man, later identified as

Lucero, standing in the front yard of the house. When Lucero saw the officer, he yelled, "Oh, fuck" and ran across the street to a parked black Honda. Lucero got into the Honda and drove off rapidly, with Officer Bernholtz in pursuit. Shortly thereafter, Lucero crashed the Honda. Lucero got out of the Honda and began to run. Lucero ran for about 15 feet and then surrendered as another police officer approached.

Authorities found Silveira in the driver's seat of the vehicle that had crashed into the house. Silveira suffered a total of six gunshot wounds, all to his upper body and head. Silveira died from the gunshots.

### 3. *Lucero's police interview*

Approximately six hours after the killing, Fontana Police Detective Daniel Delgado interviewed Lucero.[3] During the interview, Lucero admitted calling Officer Porch the night before the killing in order "to get [Silmi]." Lucero also acknowledged going to the scene of Officer Porch's traffic stop of Silmi and asking Silmi if Silmi wanted him to take possession of Silmi's Mercedes. According to Lucero, Silmi declined the offer, explaining to Lucero that he had "drop-offs" from his business.

Lucero told Detective Delgado that Silveira came and got Silmi's money. Lucero explained that later that evening, he went back to the barbershop and visited with Silveira for the remainder of the night. The following morning, at approximately 7:00 a.m., Silmi called Silveira and asked Silveira to pick him up from jail. Lucero asked Silveira to drive him to his van, which was parked around the corner from his home.

When they arrived at Lucero's van, Lucero sat in his seat for a few seconds. Silveira asked Lucero, "[W]hat's up?" Lucero then "turned on him," pulled out a .32-caliber handgun and told Silveira to "pop the trunk." Lucero started to get out of the car. Silveira screamed and began to drive off. Lucero fired several gunshots at Silveira.

Lucero watched the car Silveira was driving crash into a house. He then ran to his van and drove home. He wrapped the gun in a towel and placed it on the back part of the couch behind the house. Lucero stated that he then "figured, fuck I just killed him. And now I've got to get the money, you know?"

After changing shirts, Lucero drove back to the scene of the shooting in a Honda, parked around the corner, and removed the license plates from the

---

[3] The People played a video recording of the interview for the jury.

Honda. Lucero then approached the vehicle Silveira was driving and saw that Silveira was dead. Lucero reached inside a window of the car, unlocked the door, put the car in park, and grabbed the keys. Lucero then removed bags of cash from the trunk of the car. At that point, Lucero saw a police officer, and said, "[O]h[,] fuck." Lucero dropped the bags of cash, ran to his Honda, and drove off. Shortly thereafter, he crashed the Honda and surrendered to police.

At one point in the interview, Lucero stated, "This was just fucking [the] answer to all of my problems so fast. You know? Money is a bitch, dude."

### 4. *Evidence of Lucero's use of methamphetamine prior to the killing*

During his interview with Detective Delgado, while discussing the killing, Lucero said, "It was a mistake. A horrible mistake. A drug induced mistake." Lucero stated that the night before the killing, he had been "smoking dope [methamphetamine] all night," and explained that he, together with Silveira and another person, had smoked a total of two grams of methamphetamine. Lucero also said that recently, he had been "smoking it all day."[4]

Near the end of the interview, Lucero read a statement to Detective Delgado that he had written after being taken into custody. In the statement, Lucero wrote that he had been "heavy on drugs." Lucero also stated, "Meth is the worst thing that ever happened to . . . me. Today I felt out of body. I didn't have self conscious [*sic*] to stop. I couldn't. . . . The dope still has me in a daze." Lucero also stated, "I haven't slept more than [five] hours the last four days. . . . I lost control of myself between 7 pm and this morning."

After Lucero read his statement, Detective Delgado asked Lucero whether he would like to see his wife. Lucero answered, "I can't . . . not like this." Detective Delgado responded, "Well you're still high," and told Lucero, "Couple of days, sober up . . . she's going to be able to visit you over there."

Detective Delgado testified Lucero appeared to be drowsy and fell asleep while in custody at the police station prior to the interview. Delgado also testified that he believed that Lucero was still "high" during the interview because he was "having problems speaking."[5] Detective Delgado said that Lucero had difficulty reading his own handwriting toward the end of the interview when Lucero read his statement to Delgado.

---

[4] Detective Delgado stated during the interview that Lucero's family had told Delgado that Lucero had been "wrapped up doing some dope for like about [two] weeks."

[5] The killing occurred at approximately 7:00 a.m. Lucero was taken into custody shortly after the killing, and Delgado interviewed Lucero from approximately 1:00 p.m. to 2:00 p.m. that same day.

B.  *Procedural background*

A jury found Lucero guilty of murder (§ 187, subd. (a)) (count 1), robbery (§ 211) (count 2), unlawful possession of ammunition (§ 30305, subd. (a)(1)) (count 3), possession of a firearm by a felon (§ 29800, subd. (a)) (count 4), and assault with a firearm (§ 245, subd. (a)(2)) (count 5). In addition, with respect to counts 1, 2, and 5, the jury found that Lucero personally and intentionally discharged a firearm causing bodily injury or death within the meaning of section 12022.53, subdivision (d), personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), and personally used a firearm within the meaning of section 12022.53, subdivision (b). The jury further found Lucero committed the murder during the course and commission of a robbery.

In a bifurcated proceeding, the trial court found that Lucero had suffered a prior strike conviction (§§ 1170.12, subds. (a)–(d), 667, subds. (b)–(i)) and a prior serious felony conviction (§ 667, subd. (a)(1)).

The trial court sentenced Lucero to a determinate sentence of 3 years 4 months, and an indeterminate sentence of 105 years to life.

III.

DISCUSSION

A.  *Any error in failing to instruct on the lesser included offense of second degree murder was harmless and the trial court did not err in failing to instruct on the lesser included offenses of voluntary manslaughter and involuntary manslaughter*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B.  *The trial court properly instructed the jury that it could not consider Lucero's voluntary intoxication for purposes of determining the truth of the section 12022.53, subdivisions (c) and (d) firearm enhancement allegations*

Lucero claims that the trial court erred in instructing the jury that it could not consider his voluntary intoxication for purposes of determining the truth of the section 12022.53, subdivisions (c) and (d) firearm enhancement allegations attached to counts 1, 2, and 5. Lucero contends that "the mental state required for a true finding on the gun allegation[s] is clearly one of

---

[*]See footnote, *ante,* page 750.

specific intent," and thus, evidence of his voluntary intoxication was admissible in determining the truth of such allegations. We review Lucero's claim de novo. (See *People v. Guiuan* (1998) 18 Cal.4th 558, 569–570 [76 Cal.Rptr.2d 239, 957 P.2d 928] [jury instruction claim that involves the determination of applicable legal principles is reviewed de novo].)

The trial court instructed the jury pursuant to a modified version of CALCRIM No. 3426 in relevant part as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the specific intent to take property by force or fear. [¶] . . . [¶] You may not consider evidence of voluntary intoxication for any other purpose. Voluntary intoxication is not a defense to . . . any of the special allegations."[14]

■ Section 12022.53, subdivision (c) provides a sentence enhancement for any person who, in the commission of specified felonies, "personally and intentionally discharges a firearm . . . ." Section 12022.53, subdivision (d) provides a sentence enhancement for any person who, in the commission of certain specified felonies, "personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice . . . ."

■ "[E]vidence of voluntary intoxication is *admissible* on the issue of whether or not a defendant actually formed a required specific intent . . . ." (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312 [149 Cal.Rptr.3d 167], italics added.) However, "[e]vidence of voluntary intoxication is *inadmissible* to negate the existence of general criminal intent." (*People v. Atkins* (2001) 25 Cal.4th 76, 81 [104 Cal.Rptr.2d 738, 18 P.3d 660], italics added; see § 29.4, subd. (b) ["Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent . . . ."].)

■ " 'The distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender' and the availability of voluntary intoxication as a defense." (*People v. Hering* (1999)

---

[14] As noted in the unpublished portion of this opinion, the trial court also instructed the jury concerning voluntary intoxication pursuant to a modified version of CALCRIM No. 625. In that instruction, the court also instructed the jury that it could consider evidence of Lucero's voluntary intoxication for the limited purpose of determining whether he "acted with the specific intent to take property by force or fear." The court also instructed the jury, "You may not consider evidence of voluntary intoxication for any other purpose."

In addition, the court instructed the jury that "the special allegations" required proof of "general criminal intent."

20 Cal.4th 440, 445 [84 Cal.Rptr.2d 839, 976 P.2d 210] (*Hering*).) "When the definition of a crime [or an enhancement] consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*People v. Hood* (1969) 1 Cal.3d 444, 456–457 [82 Cal.Rptr. 618, 462 P.2d 370] (*Hood*).) In addition, "when the Legislature intends to require proof of a specific intent in connection with a sentence enhancement provision, it has done so explicitly by referring to the required intent in the statute. (See, e.g., former § 12022.7, subd. (a), as amended by Stats. 1994, ch. 873, § 3.)" (*In re Tameka C.* (2000) 22 Cal.4th 190, 199 [91 Cal.Rptr.2d 730, 990 P.2d 603].)[15]

■ Section 12022.53, subdivisions (c) and (d) both provide for additional punishment for a defendant who "personally and intentionally discharges a firearm" under specified circumstances. Both subdivisions refer only to the description of a particular act—discharging a firearm—without reference to the defendant's intent to achieve any additional consequence. Further, neither subdivision includes "language typically denoting specific intent crimes, such as 'with the intent' or 'for the purpose of.' " (*Hering, supra*, 20 Cal.4th at p. 446.) For instance, neither subdivision states that the discharge of the firearm must be done *with the intent to inflict* injury. (Cf. § 12022.55 ["any person who, *with the intent to inflict great bodily injury or death*, inflicts great bodily injury, as defined in Section 12022.7, or causes the death of a person, other than an occupant of a motor vehicle, as a result of discharging a firearm from a motor vehicle in the commission of a felony or attempted felony, shall be punished" (italics added)].)

■ We are not persuaded by Lucero's argument that the statute's specification that the use of the word "intentionally" in section 12022.53, subdivisions (c) and (d) indicates that the statute specifies a *specific* rather than a *general* intent. "An intentional use of a firearm in the commission of a crime does not encompass any specific intent." (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1494 [77 Cal.Rptr.3d 77] [rejecting argument that a § 12022.5, subd. (a) firearm use enhancement "requires proof that the perpetrator *specifically intended* 'to facilitate the commission of the underlying crime' "].) In short, because section 12022.53, subdivisions (c) and (d) "consist[] of only the description of a particular act,"—i.e. discharging a

---

[15] The statute cited by the Supreme Court in *In re Tameka C.* provided in relevant part, "Any person who, *with the intent to inflict the injury*, personally inflicts great bodily injury . . . shall . . . be punished . . . ." (Former § 12022.7, subd. (a), as amended by Stats. 1994, ch. 873, § 3, p. 4427, italics added.)

firearm—"without reference to intent to do a further act or achieve a future consequence," the enhancements require only proof of the defendant's general intent. (*Hood, supra,* 1 Cal.3d at pp. 456–457.)

■ Accordingly, we conclude that the trial court properly instructed the jury that it was not to consider evidence of Lucero's voluntary intoxication in determining the truth of the section 12022.53, subdivisions (c) and (d) firearm enhancement allegations.

C.  *The abstract of judgment must be corrected*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the abstract of judgment in accordance with part III.C, *ante,* and to forward the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

Huffman, Acting P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 10, 2016, S234916.

---

\*See footnote, *ante,* page 750.